Steve W. Berman (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
(206) 623-7292
*steve@hbsslaw.com*

Elaine T. Byszewski (SBN 222304)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
(213) 330-7150
*elaine@hbsslaw.com*

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN PALMER, on behalf of himself and all others similarly situated, | Case No.  **'18 CV0459 DMS KSC** |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | **COMPLAINT** |
| WAL-MART STORES, INC., a Delaware corporation, CAL-MAINE FOODS, INC., a Delaware corporation, | DEMAND FOR JURY TRIAL |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.      OVERVIEW ................................................................................................1

II.     PARTIES ....................................................................................................3

III.    JURISDICTION AND VENUE ................................................................3

IV.     FACTUAL ALLEGATIONS ....................................................................4

      A.      Defendants Are Responsible for the Marketing and Sale of Store-Brand Eggs for Walmart, Labeled as Having Come From Hens "With Outdoor Access." ......................................................................4

      B.      The Hens Producing Cal-Maine's Store-Brand Eggs for Walmart Are Actually Confined to Industrial Barns, Without Outdoor Access. .................................................................................................6

      C.      The "With Outdoor Access" Label Is Material to Consumers. .................................17

      D.      Eggs Touting Animal Welfare Attributes Command a Significant Price Premium Over Conventional Eggs ..................................................22

V.      CLASS ACTION ALLEGATIONS ........................................................25

VI.     CAUSES OF ACTION............................................................................27

FIRST CAUSE OF ACTION
VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.)................................................27

SECOND CAUSE OF ACTION
VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT
(CAL. CIV. CODE § 1750, *ET SEQ*.)..........................................................29

THIRD CAUSE OF ACTION
VIOLATIONS OF THE FALSE ADVERTSING LAW
(CAL. BUS. & PROF CODE §§ 17500, *ET SEQ*.)......................................30

FOURTH CAUSE OF ACTION
BREACH OF CALIFORNIA COMMON LAW  OF UNJUST
ENRICHMENT ................................................................................................31

JURY TRIAL DEMAND............................................................................32

1    Plaintiff Brian Palmer (plaintiff) brings this action on behalf of himself and all others

2    similarly situated against Wal-Mart Stores, Inc., and Cal-Maine Foods, Inc., both Delaware

3    corporations (collectively, defendants).  Plaintiff's allegations against defendants are based upon

4    information and belief and upon investigation of plaintiff's counsel, except for allegations

5    specifically pertaining to plaintiff, which are based upon his personal knowledge.

6                                          I.      OVERVIEW

7    1.    America's largest and most profitable food companies should be honest and forthright

8    in their dealings with consumers.  When these food companies fail to uphold their responsibility for

9    ensuring truthful advertising to consumers, such consumers are deceived into paying more for

10   products or buying products that they otherwise would not have.  Such food companies should be

11   required to make restitution to the consumers they have deceived.

12   2.    Walmart is the largest and most profitable retailer in the world.  Walmart is

13   responsible for the marketing and sale of shell eggs to consumers across the United States, including

14   in California, under various store brands, including its own private label.

15   3.    Cal-Maine is one of the largest and most profitable shell egg companies in the United

16   States.  Cal-Maine is responsible for the production and marketing of shell eggs to consumers

17   nationwide, including in California, under various store brands, including a private label for

18   Walmart.

19   4.    Defendants market these private label eggs as having provided the laying hens "with

20   outdoor access."  Consumers typically pay a significant premium for such eggs, due to the touted

21   improvements to the welfare of laying hens, which is itself important to consumers as well as the

22   perceived health benefits from eating the eggs of better treated hens.

23   5.    A recent investigation performed by plaintiffs' counsel, however, demonstrates that

24   the Cal-Maine hens supplying these private label eggs for Walmart do not actually have access to the

25   outdoors.

26   6.    Instead, Cal-Maine confines its laying hens to industrial barns without outdoor access.

27   Upon counsel's investigation of one such industrial barn complex, there was not a single hen outside

28

COMPLAINT                                        - 1 -
010691-11 1017269 V1

on the grounds.  Rather, the hens are kept inside enclosed structures, never stepping foot out onto the pasture surrounding the industrial barns.  The industrial barns have two parts: the central interior and the enclosed porches that run along the side.  The enclosed porches, which purportedly provide outdoor access, are fully roofed and screened.  A reasonable consumer would not consider this barred and screened porch to be outdoor access:



7.     And each porch can hold only a small fraction of the flock housed in the industrial barn.  Indeed, inside one porch, only about one hundred of tens of thousands of hens—less than 1% of the flock—were visible.  And inside another porch, there were fewer still.  This is not outdoor access for the laying hens, as promised by defendants to the consumers paying a premium for it.

8.     Thus, consumers paying more for these eggs have been deceived.  Defendants falsely advertise their "farm fresh" eggs as having been laid by hens "with outdoor access," such that they have failed to meet their basic obligation of truthfulness to consumers.  A recent survey demonstrates that a reasonable consumer believes outdoor access to mean that all animals have access to outdoor pasture and fresh air throughout the day.  Had plaintiff and class members known the truth, they would not have purchased these private label eggs or paid as much for them.

9.     Accordingly, defendants' conduct described herein violates the (i) California's Business & Professions Code §§ 17200, *et seq.* (the Unfair Competition Law or UCL); (ii) California Civil Code §§ 1750, *et seq.* (the Consumers Legal Remedies Act or CLRA); and (iii) California's

1   Business & Professions Code §§ 17500, *et seq.* (the False Advertising Law or FAL).  Plaintiff brings

2   this action on behalf of a California class for restitution, injunctive relief, and any other relief

3   deemed appropriate by the court to which this case is assigned.

4                                   **II.      PARTIES**

5          10.     Plaintiff Brian Palmer is a resident of Spring Valley, California.  During the several

6   years preceding the filing of this complaint, plaintiff purchased Walmart's private label shell eggs on

7   a regular basis, including from the Walmarts located in La Mesa, Eastlake, and Lemon Grove,

8   California.  Prior to purchase at those retail locations, plaintiff saw the product packaging stating that

9   the hens were provided "with outdoor access."  Plaintiff would not have purchased the shell eggs or

10   paid as much for them had defendants disclosed the truth.  Plaintiff seeks restitution and injunctive

11   relief requiring defendants to cease their deceptive marketing and sale of private label eggs marketed

12   as providing hens "with outdoor access."

13          11.     Wal-Mart Stores, Inc., is a Delaware company with its principal place of business in

14   Bentonville, Arkansas.  Wal-Mart is responsible for the marketing and sale of shell eggs to

15   consumers under its Organic Marketside private label.

16          12.     Cal-Maine Foods, Inc., is a Delaware corporation headquartered in Jackson,

17   Mississippi.  Cal-Maine is responsible for the production, processing, and marketing of shell eggs to

18   consumers throughout the United States, including in California, under various store brands,

19   including Organic Marketside for Walmart.

20                         **III.      JURISDICTION AND VENUE**

21          13.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d),

22   because the amount in controversy for the Class exceeds $5,000,000, and the class includes members

23   who are citizens of a different state than defendant.

24          14.     This Court has personal jurisdiction over defendant because the injury to plaintiff and

25   class members arises from the marketing and sale of shell eggs in California.

26          15.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because Wal-Mart Organic

27   Marketside shell eggs are sold throughout the State of California, including in this judicial district.

28

COMPLAINT                                     - 3 -
010691-11 1017269 V1

# IV.    FACTUAL ALLEGATIONS

**A.    Defendants Are Responsible for the Marketing and Sale of Store-Brand Eggs for Walmart, Labeled as Having Come From Hens "With Outdoor Access."**

16.    According to its website, Cal-Maine is the "largest producer and marketer of shell eggs in the United States."[1]  It operates in a single segment, "which is the production, grading, packaging, marketing and distribution of shell eggs."[2]  In 2016, Cal-Maine sold over twelve billion shell eggs, representing approximately 23% of domestic shell egg consumption.[3]  Besides its own brands, Cal-Maine "produce[s], market[s], and distribute[s] private label specialty shell eggs."[4]

17.    Walmart (including Sam's Club) is Cal-Maine's top customer, representing almost 30% of Cal-Maine's total sales in 2016.[5]  Cal-Maine produces and packages eggs to be sold under Walmart's store brands.  One of those private labels is Organic Marketside.

18.    Walmart is the "largest retailer in the world," with over 260 million customers and revenue of $485.9 billion for fiscal year 2017.[6]  Its supercenters "offer a one-stop shopping experience by combining a grocery store with fresh produce, bakery, deli and dairy products with electronics, apparel, toys and home furnishings."[7]  Likewise, its neighborhood markets "offer fresh produce, meat and dairy products, bakery and deli items, household supplies, health and beauty aids and a pharmacy."[8]  Wal-Mart markets and sells shell eggs to consumers under its Organic Marketside private label, including those produced and packaged by Cal-Maine.

19.    These private label shell egg cartons are each marked with a USDA plant number associated with the egg processor.  For example, P1100 is the USDA plant number for one of Cal-Maine's major industrial complexes, located in Chase, Kansas[9]:

---

[1] http://calmainefoods.com/company/.

[2] *Id*.

[3] *Id*.

[4] *Id*.

[5] http://calmainefoods.com/media/1133/calm-october-2016.pdf, at 12.

[6] https://corporate.walmart.com/our-story.

[7] https://corporate.walmart.com/our-story/our-business.

[8] *Id*.

[9] https://apps.ams.usda.gov/plantbook/Query_Pages/PlantBook_Query.asp#PlantNumber.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



20.     P1100 is a certified organic operation for the handling of shell eggs.[10]  Cal-Maine also owns certified organic production facilities in Chase, Kansas.  Accordingly, Cal-Maine produces shells eggs at its facilities in Chase, Kansas, and then packages them at its plant in Chase, Kansas, for marketing and sale under private label for Walmart.

21.     As depicted, defendants advertise these store brand "farm fresh" eggs as laid by hens "free to roam, nest and perch in a protected barn with outdoor access":[11]



22.     As described below, however, Cal-Maine's hens are confined to industrial barns and do not actually have access to the outdoors.

_____

[10] https://organic.ams.usda.gov/Integrity/Search.aspx.

[11] And plaintiff notes that the abstract packaging is, in part, grass green, with a hen in mid-step.

**B.     The Hens Producing Cal-Maine's Store-Brand Eggs for Walmart Are Actually Confined to Industrial Barns, Without Outdoor Access.**

23.     Along with Cal-Maine's 24,000 square foot packing plant (P1100) on Avenue K in Chase, Kansas, Cal-Maine's neighboring parcel on 6th Road has eight industrial poultry houses, each measuring 370 feet by 113 feet and each housing tens of thousands of hens, as partially depicted in this picture taken before the completion of construction:



24.     In 2014, Cal-Maine completed its acquisition of Delta Egg Farm, LLC, which included the above-depicted "organic egg production complex with capacity for approximately 400,000 laying hens located near Chase, Kansas."[12]  As stated in its 2014 annual report, after its acquisition of Delta Egg Farm, Cal-Maine embarked on an "organic facility expansion" in Chase,

---

[12] http://www.businesswire.com/news/home/20140217005423/en/Cal-Maine-Foods-Announces-Agreement-Acquire-Remaining-Interests.  Property records show that Delta Egg Farm, LLC, was the prior owner of this parcel 080-067-26-0-00-00-005.00-0.

1  Kansas.[13]  Since that time, Cal-Maine has doubled the industrial barns at this location from four to

2  eight.

3      25.    In September and October of 2017, on days when it was 84°F and 70°F, respectively,

4  counsel investigated this Cal-Maine industrial egg farm.  Outside on the grounds, there was not a

5  chicken in sight.  Instead, Cal-Maine confines its laying hens to industrial barns without outdoor

6  access.  The hens are kept inside these enclosed structures, never stepping foot out onto the grass

7  surrounding the industrial barns.  The industrial barns have two parts: the central interior and the

8  enclosed porches that run along the side.  The porches, which purportedly provide outdoor access,

9  are fully roofed and screened, without access to the pasture surrounding the industrial barns.  A

10  reasonable consumer would not deem this outdoor access.

11      26.    In addition, each porch can hold only a small fraction of the flock housed in the

12  industrial barn.  Indeed, inside one porch, only about one hundred of tens of thousands of hens—less

13  than 1% of the flock—were visible.  And inside another porch, there were fewer still.  This is not

14  outdoor access for the hens, as promised by defendants to the consumers paying a premium for it

15      27.    Pictures taken during counsel's investigation document the lack of outdoor access for

16  the laying hens.  In the below picture, you can see in the distance the completed construction of the

17  eight industrial barns:



26

27  _____
[13] http://phx.corporate-

28  ir.net/External.File?item=UGFyZW50SUQ9MjQ5NjU3fENoaWxkSUQ9LTF8VHlwZT0z&t=1, at
13.

COMPLAINT            - 7 -
010691-11 1017269 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28.     As you get closer, you can see that each barn has fans at the end to circulate air inside the barn, with screened porches running along each side:



29.     Viewed head on, with trucks parked to the right, you can see that the porches are completely enclosed—with the same roof as the interior part of the industrial barn, an enclosing wall on one side and enclosing bars with screening on the other side:



COMPLAINT                                       - 8 -
010691-11 1017269 V1

30.     A closer view of the enclosed porches confirms that they are without access to non-enclosed space or to the pasture surrounding the industrial barns.  The theoretical ability to view the outdoors is not the same as having access to it:



31.     The man standing in the porch provides perspective on the vast size of these industrial barns—the screened side is three times his height:



32.     Here is a close up of the individual, who is maneuvering an interior door, which separates the enclosed porch into sections:



33.     To the right of the man's feet, you can see one of the lower popholes that provide access for a small fraction of the laying flock to the enclosed porch:



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

34.   And this picture also shows points of debris on the screen that runs across the vertical slats and keeps the hens on the enclosed porch:



35.   The below picture shows another of the approximately four lower popholes along each side of the vast industrial barn:



36.     And because this is a multi-tiered barn, there are also approximately four upper popholes along each side.  You can see the little door at the top of the ramp (recall that the man was one third the height of the screened side):



37.     And here is a close up of an upper pophole:



38.     When counsel's investigation continued in October, the man shown above to demonstrate proportion was no longer working on the interior door of the porch.  Yet inside the porch visible from the road, there were only about one hundred of the tens of thousands of laying hens housed in the barn—or less than 1% of the flock.  And none were actually outside the enclosure pecking in the pasture surrounding the industrial barns.

39.     Here are a few hens at one end of the screened and barred porch:



40.     And here is a closer view of hens at one end of the enclosed porch:



41.    Here are hens seen at the base of the long ramp/steps:



42.    And here is a closer view of hens at the base of the ramp/steps.  None is able to leave the industrial barn or peck and scratch in the pasture surrounding the industrial barn:



43.    Here are hens clustered near a lower pophole:



44.    And here are some hens scattered in between popholes.  None have outdoor access—they can only look out at it:





45.    At a second enclosed porch, even fewer hens were present:



46.    Of the twenty or thirty seen along the length of this porch, here is a hen on the platform at the top of the ramp/steps:



47.    And here is a hen near the base of the ramp/steps.  This is not access to the outdoors:



48.     Thus, each of these eight industrial barns, together housing hundreds of thousands of hens, has roofed porches running along both sides, enclosed by bars and screening, without any access to the pasture surrounding the industrial barns.  A reasonable consumer would not consider this to be "outdoors."

49.     Moreover, each porch can hold only a tiny fraction of the tens of thousands of hens housed in the central interior of the structure.

50.     Further, only a tinier fraction still—less than 1% of the flock—was seen out on the enclosed porches.  There are multiple reasons for this.

51.     Each enclosed porch has popholes through which some hens can enter from the central portion of the barn into the porch and later exit the porch back into the central portion of the barn.  For each of these barns, however, there is only two porches with about eight popholes each, including both lower and upper, such that any one of the tens of thousands of hens inside each industrial barn would need to travel over an immense quantity of birds to get to a pophole.  But hens are not naturally inclined (or even physically capable) of trampling or flying over much of a massive flock to get to distant popholes.  Rather, the natural behavior of chickens precludes them from aggressively encroaching on the space of other birds in an effort to reach a door.  In addition, the hens entering the enclosed porch from the upper pophole need to walk down a long, steep ramp to reach the bottom.  For these reasons, a reasonable consumer would not consider the popholes of industrial barns to provide meaningful access to the enclosed porches—and certainly not access to the outdoors.

52.     Thus, a claim that hens housed in such a manner are provided "with outdoor access" is false and misleading both as to "access" and as to "outdoors."  Instead, Cal-Maine's hens are confined to industrial poultry houses and do not have actual outdoor access, rendering defendants' packaging of the eggs false and misleading.

C.     **The "With Outdoor Access" Label Is Material to Consumers.**

53.     Surveys consistently demonstrate that consumers have become increasingly interested in farm animal welfare.  According to an online survey of 1,000 Americans dated June 29, 2016,

more than three in four (77%) consumers say that they are concerned about the welfare of animals that are raised for human food, including laying hens.[14]  In addition, "more than two-thirds (69%) of consumers pay some or a lot of attention to food labels regarding how the animal was raised."[15]  And consumers' concern "about how animals are raised has increased over time, as 74% of consumers say they are paying more attention to the labels that pertain to how an animal was raised than they were five years ago."[16]

54.     Part of raising animals in a way beneficial to their welfare includes maintaining living conditions and health care practices in a way that accommodates the health and natural behavior of the animals, including laying hens.  True outdoor access is intended to ensure a production system that provides living conditions that allow the chickens to satisfy their natural behavior patterns and provides preventative health care benefits.  Such true outdoor access contributes to preventative health care management by enabling hens to develop and reproduce under conditions that reduce stress, strengthen immunity, and deter illness.  And true outdoor access affords hens the freedom of choice to satisfy natural behavior patterns.  Being outside in the sunlight to engage in natural behaviors like scratching in the soil and pecking in the grass thus improves the welfare of laying hens.  Here is an example of a large-scale egg farm with hens that are actually outdoors:



[14] https://www.aspca.org/animal-cruelty/farm-animal-welfare/aspca-farm-surveys; https://www.aspca.org/sites/default/files/publicmemo_aspca_labeling_fi_rev1_0629716.pdf.

[15] *Id.*

[16] *Id.*

55.     Accordingly, the "with outdoor access" claim is material to consumers, and defendants therefore use that purported attribute to tout its product.  But, as set forth above, that claim is false and misleading to consumers.

56.     Indeed, an April 2104 survey of 1,000 consumers nationwide conducted by the American Society for the Prevention of Cruelty to Animals, found that almost seventy percent of consumers (68%) believe outdoor access to mean that "[a]ll animals have access to outdoor pasture and fresh air throughout the day."[17]  Moreover, consumers believe the following should be conditions of outdoor access:[18]



57.     Thus, it is materially misleading for defendants to claim that the hens are provided "with outdoor access" when a reasonable consumer believes that to mean there is access for the majority of animals at any given time to open pasture and vegetation throughout the day.

_____

[17] http://www.aspca.org/sites/default/files/aspca_organic_labeling_public_memo_4-10-14.pdf.
[18] *Id.*

58.     Another recent article asks its readers: "Does 'outdoor access' mean claws on grass? Or are screened-in porches acceptable?"[19]  The overwhelming response was that porches are not acceptable.  For example, consumers had the following to say:

- Yes, of course! How can they call them free range if they can't even go outside?

   Tracylekels (9/17/17)

- Yes. If labeled organic and free range, they must eat organic feed and roam outside at will.

   BDSmith (9/17/17)

- This is a no brainer.....let the chickens or hens graze outdoors in large fields if you want to be able to call them free range, and organic. The poultry industry has been playing word games with the wording a vast majority of all their products. The public truest has no idea what their [sic] purchasing based on these misleading labels, and this is wrong.

   Brad (9/17/17)

- Yes! We pay more for the eggs and chicken meat with the belief that these animals are treated humanely and with as natural a diet as possible only to find out they are treated as terribly as most factory farmed animals. If I'm gonna pay extra I want them to be out there enjoying outside, eating bugs and being free range!

   Abbi (9/17/17)

- 'Porches'? Give me a break--this cute name obscures the fact that this is just a way of reintroducing factory farming for organic hens. Truth in advertising! The standard is about

---

[19] https://www.countable.us/articles/1114-organic-chickens-outdoor-access.

1    ensuring that consumers know what they are buying, without

2    having to be detectives and visit personally every farm that

3    claims its hens are organic. 100,000 hens in each coop,

4    smack up against another coop, with no outside access,

5    should not be called 'organic.' The whole point of organic

6    regulations is to reconnect the animals with nature. A

7    concrete floor with screening, aka 'porch,' with no grass, sun,

8    natural water source, or room to move is not nature.

9    Jerise (9/18/17)

10   • Should free range mean free range? Of course! The real issue

11   seems to be that corporate interests will pay lawyers a huge

12   amount of money to try to twist common language and get

13   around the meaning of the labels in the hopes that the profit

14   they make with delays and arguments and getting away with

15   abuses.

16   Lucinda (9/18/17)

17   59.    So it is materially misleading for defendants to claim that laying hens are provided

18   "with outdoor access" when reasonable consumers believe this to mean that the hens can put their

19   claws in the grass—not be confined to enclosed porches.

20   60.    To be sure, under new, clarifying regulations issued during the Obama administration

21   but presently postponed under the Trump administration until May 14, 2018,[20] defendants would not

22   even qualify for use of the "organic" label under the National Organic Program (NOP), which

23   governs use of the term "organic."[21] Use of "organic" on the label requires, *inter alia*, that there is

24   "access for all animals to the outdoors,"[22] but the comments received by USDA demonstrated "there

25   is a gap between how consumers think birds are raised on organic farms and the actual practices of

26   ————————————————

27   [20] 82 Fed. Reg. 52643.

28   [21] 7 C.F.R. §205.102.

     [22] 7 C.F.R. § 205.239.

COMPLAINT                          - 21 -
010691-11 1017269 V1

some—but not all—organic producers"[23] using the porch system, because "consumers expect that organic birds come into contact with soil and vegetation and can exhibit natural behaviors."[24]

61.     Indeed, a recent Los Angeles Times article describes the porch system as a "loophole in organic regulations that has allowed factory egg farms, some with 100,000 hens to a barn, to earn an organic imprimatur without much more than a nod to letting chickens leave their coop—that is, attaching a gated, screened porch to their barns."[25]  And, as an industry insider notes, when you put hens in "a building with no windows, no natural light and a screened porch and label it as 'organic,'" consumers are "going to be a little bit ticked off."[26]

62.     Thus, under the clarifying regulation if and when it becomes effective, Cal-Maine's private label eggs for Walmart here at issue would not even qualify as "organic."[27]  But defendants take their marketing one step further—beyond the purview of the NOP—and affirmatively describe the hens as free to roam "with outdoor access" though that description is false and misleading to a reasonable consumer.

**D.     Eggs Touting Animal Welfare Attributes Command a Significant Price Premium Over Conventional Eggs.**

63.     As further evidence of its materiality to consumers, consumers usually pay a significant price premium for eggs touting animal welfare attributes.  The Cal-Maine eggs marketed

---

[23] 82 Fed. Reg. 7042, 7068.

[24] USDA Agricultural Marketing Service, National Organic Program, *Organic Livestock and Poultry Practices Final Rule: Questions and Answers* (Jan. 2017), at 1, available at https://www.ams.usda.gov/sites/default/files/media/OLPPExternalQA.pdf.

[25] http://www.latimes.com/business/la-fi-organic-eggs-20171121-story.html.

[26] *Id.*

[27] The clarifying regulation at § 205.241 includes, *inter alia*, the following outdoor space requirements: "(1) Access to outdoor space and door spacing must be designed to promote and encourage outside access for all birds on a daily basis…. (2) At least 50 percent of outdoor space must be soil. Outdoor space with soil must include maximal vegetative cover appropriate for the season, climate, geography, species of livestock, and stage of production…. (4) For layers (Gallus gallus), outdoor space must be provided at a rate of no less than one square foot for every 2.25 pounds of bird in the flock…." 82 Fed. Reg. 7042, 7091.  Outdoor access need not be provided for pullets under 16 weeks of age or during nest box training not to exceed five weeks.  *Id.* at 7092.

And § 205.2 defines soil as the "outermost layer of the earth comprised of minerals, water, air, organic matter, fungi, and bacteria in which plants may grow roots," and vegetation is defined as "[l]iving plant matter that is anchored in the soil by roots and provides ground cover."  *Id.* at 7089.

and sold at Walmart are no exception.  There is a premium for cage-free eggs as compared to conventional eggs, and a further premium still for cage-free eggs "with outdoor access":

| Shell Egg Product | Specialty Description | Cost |
|---|---|---|
| Great Value (Walmart Brand) | No | $1.86 |
| Marketside (Walmart Brand) | Yes, cage free | $2.98 |
| Organic Marketside (Walmart Brand) | Yes, cage free with outdoor access | $3.97 |

For a premium price:



And for a further premium still:



64.     Thus, consumers pay a significant premium for Cal-Maine's private label eggs for Walmart, and in particular for "outdoor access," which further supports the materiality of their marketing claim to consumers.

65.     Indeed, defendant Cal-Maine acknowledges that prices for such specialty eggs are generally higher because their perceived benefits are important to consumers.  As it reports online, "We are one of the largest producers and marketers of value-added specialty shell eggs in the U.S." and "we classify nutritionally enhanced, cage-free, organic and brown eggs as specialty products."[28] As of 2017, specialty eggs represent 24.69 percent of dozens sold and 50.3 percent of Cal-Maine's sales revenue.[29]  As it explains: "Prices for specialty eggs…are generally higher due to consumer willingness to pay for the perceived increased benefits from those products."[30]

66.     The perceived increased benefits from those products include improved animal welfare for its own sake, as well as improvements to human dietary health resulting from the improved animal welfare.  Indeed, a 2007 research study performed by Mother Earth News found that eggs from hens with true outdoor access to pasture may contain:

- 1/3 less cholesterol;
- 1/4 less saturated fat;
- 2/3 more vitamin A;
- 2 times more omega-3 fatty acids;
- 3 times more vitamin E;
- 7 times more beta carotene; and
- 3 to 6 times for vitamin D.[31]

67.     Other studies make similar claims.  For example:

- Pasture-raised eggs contain 70% more vitamin B12 and 50% more folic acid (British Journal of Nutrition, 1974);

---

[28] http://calmainefoods.com/company/.

[29] http://calmainefoods.com/media/1133/calm-october-2016.pdf, at 24.

[30] http://calmainefoods.com/company/.

[31] https://www.motherearthnews.com/real-food/free-range-eggs-zmaz07onzgoe.

- Pasture-raised eggs are higher in vitamin E and omega-3s than those obtained from battery-cage hens (Animal Feed Science and Technology, 1998);

- Pasture-raised eggs are 10% lower in fat, 34% lower in cholesterol, contain 40% more vitamin A, and are 4 times higher in omega-3s than standard U.S. battery-cage eggs (Gorski, Pennsylvania State University, 1999); and

- Pasture-raised eggs have three times more omega-3s and are 220% higher in vitamin E and 62% higher in vitamin A than eggs obtained from battery cage hens (Karsten, Pennsylvania State University, 2003).[32]

Thus, Cal-Maine is correct about the perceived benefits consumers attribute to specialty eggs.

68.     Survey data supports Cal-Maine's acknowledgement: 81% of respondents to a poll of 1,204 adults nationwide stated that they were "willing to pay more for eggs from chickens" that they know were "raised in a humane manner."[33]

## V.     CLASS ACTION ALLEGATIONS

69.     Under Rule 23 of the Federal Rules of Civil Procedure, plaintiff seeks certification of a class defined as follows:

> All residents of California who purchased Organic Marketside eggs from a Walmart supplied by a porch-based industrial egg farm, including but not limited to Cal-Maine's porch-based industrial egg farm located in Chase, Kansas.

70.     Excluded from the class are defendants; the officers, directors or employees of defendants; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of defendants.  Also, excluded from the class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

---

[32] https://www.smallfootprintfamily.com/benefits-of-pasture-raised-eggs.

[33] *U.S. Public Supports Humane* Treatment *for Hens*, Zogby International for Farm Sanctuary (Sept. 2000), accessible at http://www.isecruelty.com/poll.php.

COMPLAINT                                    - 25 -
010691-11 1017269 V1

71.     Plaintiff does not know the exact number of class members at the present time. However, due to the nature of the trade and commerce involved, there appear to be tens if not hundreds of thousands of class members such that joinder of all class members is impracticable.

72.     The class is defined by objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other consumer fraud cases and complex class actions.

73.     There are questions of law and fact common to the class.  Defendants' deceptive marketing and sale of shells eggs similarly impact class members, all of whom purchased and paid more than they should have for shell eggs.

74.     Plaintiff asserts claims that are typical of the class.  Plaintiff and all class members have been subjected to the same wrongful conduct because they all have purchased deceptively advertised shell eggs.  As a result, and like other members of the class, plaintiff purchased and paid an amount for shell eggs which he otherwise would not have paid.

75.     Plaintiff will fairly and adequately represent and protect the interests of the class. Plaintiff is represented by counsel competent and experienced in both consumer protection and class action litigation.

76.     Class certification is appropriate because defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

77.     Class certification is also appropriate because common questions of law and fact substantially predominate over any questions that may affect only individual members of the class, including, *inter alia*, the following:

a.     Whether defendants advertised their shell eggs as providing the laying hens with access to the outdoors;

b.     Whether these laying hens did not in fact have access to the outdoors;

c.     Whether the lack of access to the outdoors would be material to a reasonable consumer purchasing shells eggs advertised as providing hens with access to the outdoors;

d.   Whether defendants' shell eggs label was likely to deceive a reasonable consumer;

e.   Whether defendants' conduct violates the UCL, FAL and CLRA;

f.   Whether the challenged practices harmed plaintiff and members of the class; and

g.   Whether plaintiff and members of the class are entitled to restitutionary, injunctive, or other relief.

78.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual class members is impracticable. Furthermore, because the injury suffered by each individual class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual class members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous.

79.   The prosecution of separate actions by the individual class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for defendants.  In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

80.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

81.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Defendants have engaged in unlawful, and unfair, and fraudulent business acts and practices and unfair, deceptive, untrue, and misleading advertising in violation of the UCL.

82.   Defendants have violated the unlawful prong by virtue of their violations of the CLRA, as described in the second cause of action.

83.     Defendants have violated the unfair prong of section 17200 because the acts and practices set forth herein offend established public policies supporting truth in advertising to consumers.  Defendants' deceptive use of the "with outdoor access" packaging is unethical, oppressive, unscrupulous and injurious to consumers.  The harm that these acts and practices cause greatly outweighs any benefits associated with them.  Defendants' conduct also impairs competition within the market for shell eggs, and prevents plaintiff and class members from making fully informed decisions about the kind of shell eggs to purchase and the price to pay for such products.

84.     Defendants have violated the deceptive prong of section 17200 because, as set forth above, they deceptively marketed shell eggs sold under private label for Walmart as providing hens "with outdoor access."  This misrepresentation of material information was likely to deceive a reasonable consumer.

85.     Plaintiff has suffered injury in fact, including the loss of money, as a result of defendants' unlawful, unfair, and/or deceptive practices.  Plaintiff and members of the class were directly and proximately injured by defendants' conduct and lost money as a result of defendants' material misrepresentations, because they would not have purchased or paid as much for the shell eggs had they known the truth.

86.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of defendants' business.  Defendants' wrongful conduct is part of a general practice that is still being perpetuated and repeated throughout the State of California.

87.     Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin defendants from continuing their unfair and deceptive business practices, to restore to plaintiff and members of the class the money that defendants acquired from them by this unfair competition, and to provide such other relief as set forth below.

88.     Plaintiff is entitled to an award of reasonable attorneys' fees under California Code of Civil Procedure Section 1021.5 for the benefit conferred upon the general public of the State of California by any injunctive or other relief entered herein.

**SECOND CAUSE OF ACTION**

**VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT**
**(CAL. CIV. CODE § 1750, *et seq*.)**

89.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

90.     Defendants are each a "person" under Cal. Civ. Code § 1761(c).

91.     Plaintiff is a "consumer," as defined by Cal. Civ. Code § 1761(d), who purchased Cal-Maine's shell eggs sold under private label for Walmart.

92.     Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…."

93.     Defendants violated this provision of the CLRA with their material misrepresentations set forth on the egg carton packaging.

94.     As set forth above, defendants deceptively marketed shell eggs sold under private label for Walmart as providing hens "with outdoor access."

95.     Plaintiff and members of the class were directly and proximately injured by defendants' conduct and lost money as a result of defendants' material misrepresentations, because they would not have purchased or paid as much for the shell eggs had they known the truth.

96.     In accordance with Civil Code § 1780 (a), plaintiff and class members seek restitutionary, injunctive and equitable relief for defendants' violations of the CLRA.  Plaintiff requests that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief, including attorneys' fees and costs, as provided in Civil Code § 1780 and the prayer for relief.  In addition, after mailing appropriate notice and demand in accordance with Civil Code § 1782(a) & (d), plaintiff will amend this complaint to include a request for damages.

97.     Plaintiff includes an affidavit with this complaint reflecting that venue in this district is proper, to the extent such an affidavit is required by Cal. Civ. Code § 1780(d) in federal court.

**THIRD CAUSE OF ACTION**

**VIOLATIONS OF THE FALSE ADVERTSING LAW**
**(CAL. BUS. & PROF CODE §§ 17500,** *et seq.***)**

98.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

99.     California Business & Professions Code §§ 17500, *et seq.* broadly proscribes deceptive advertising in this State.  Section 17500 makes it unlawful for any corporation intending to sell products or perform services to make any statement in advertising those products or services concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or not to sell those products or services as advertised at the price stated therein, or as so advertised.

100.    As alleged herein, defendants deceptively marketed shell eggs sold under private label for Walmart as providing its hens "with outdoor access."  As described above, this misrepresentation of material information was likely to deceive a reasonable consumer.

101.    Defendants knew or reasonably should know that such marketing of shell eggs was and is deceptive.

102.    Plaintiff has suffered injury in fact, including the loss of money, as a result of defendants' false advertising.  Plaintiff and members of the class were directly and proximately injured by defendant's conduct and lost money as a result of defendants' material misrepresentations, because they would not have purchased or paid as much for defendants' shell eggs had they known the truth.

103.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of defendants' business.  Defendants' wrongful conduct is part of a general practice that is still being perpetuated and repeated throughout the State of California.

104.    Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin defendants from continuing their deceptive advertising, to restore to plaintiff and members of the class the money that defendants unlawfully acquired, and to provide such other relief as set forth below.

105.     Plaintiff is entitled to an award of reasonable attorneys' fees under California Code of Civil Procedure Section 1021.5 for the benefit conferred upon the general public of the State of California by any injunctive or other relief entered herein.

<strong>FOURTH CAUSE OF ACTION</strong>

<strong>BREACH OF CALIFORNIA COMMON LAW<br>OF UNJUST ENRICHMENT</strong>

106.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

107.     To the detriment of plaintiff and class members, defendants have and continue to be unjustly enriched as a result of the wrongful conduct alleged herein.  Defendants have unjustly benefited by receiving higher prices for their shell eggs than would have been possible absent the wrongful conduct.  Between the parties, it would be unjust for defendants to retain the benefits attained by its wrongful actions.  By reason of the foregoing, defendants have violated California's common law of unjust enrichment.

108.     Accordingly, plaintiff and class members seek full restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the wrongful conduct alleged herein.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter a judgment against defendant and in favor of plaintiff, and grant the following relief:

A.     Determine that this action may be maintained as a class action with respect to the class identified herein and certify it as such under Rules 23(b)(2) and/or 23(b)(3), or alternatively certify all issues and claims that are appropriately certified, and designate and appoint plaintiff as class representative and his counsel as class counsel;

B.     Declare, adjudge and decree the conduct of defendants as alleged herein to be unlawful, unfair and/or deceptive;

C.     Enjoin defendants from continuing the unfair and deceptive marketing of its shell eggs;

1    D.    Award plaintiff and the class restitution of all monies paid to defendants as a result of

2    its unfair and deceptive business practices;

3    E.    Award plaintiff and the class reasonable attorneys' fees, costs, and pre- and post-

4    judgment interest; and

5    F.    Award plaintiff and the class such other further and different relief as the nature of the

6    case may require or as may be determined to be just, equitable, and proper by this Court.

7                               **JURY TRIAL DEMAND**

8    Plaintiff, by counsel, requests a trial by jury for all claims so triable.

9
10   DATED:  March 2, 2018                    HAGENS BERMAN SOBOL SHAPIRO LLP

11                                            By: */s/ Elaine T. Byszewski*
12                                            Elaine T. Byszewski (SBN 222304)
                                              301 N. Lake Avenue, Suite 920
13                                            Pasadena, CA  91101
                                              (213) 330-7150
14                                            elaine@hbsslaw.com

15                                            Steve W. Berman (*pro hac vice* pending)
                                              HAGENS BERMAN SOBOL SHAPIRO LLP
16                                            1918 Eighth Avenue, Suite 3300
                                              Seattle, WA  98101
17                                            (206) 623-7292
                                              *steve@hbsslaw.com*

18                                            *Attorneys for Plaintiff and the Proposed Class*

19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION RE CLRA VENUE**

I, Brian Palmer, do hereby declare and state as follows:

     1.    I am a party plaintiff in the above captioned action.  Pursuant to Cal. Civ. Code §
1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for
relief under Cal. Civ. Code § 1780(a).

     2.    This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county
that is a proper place for trial of this action because Wal-Mart Organic Marketside shell eggs are sold
throughout the State of California, including in this county.

     This declaration is signed under penalty of perjury under the laws of the State of California
this 2 3 day of February 2018.

Brian Palmer

010691-11 1017270 VI